# Defense Exhibit 2

1

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,          Case No.: 1:21-cr-00099-JTN

     v

JONATHAN JOSHUA MUNAFO,

     Defendant.

_____/

SENTENCING

BEFORE THE HONORABLE JANET T. NEFF, FEDERAL JUDGE

Grand Rapids, Michigan - Wednesday, October 26, 2022

APPEARANCES:

For the Government:    Nils R. Kessler, Esq.
                        U.S. Attorney (Grand Rapids)
                        The Law Bldg, 330 Ionia Ave, N.W.
                        Grand Rapids, MI 49501-0208
                        (616) 456-2404
                        Nils.Kessler@usdoj.com

For the Defendant:     James Stevenson Fisher, Esq.
                        Federal Public Defender (Grand
                        Rapids)
                        50 Louis St., N.W., Ste. 300
                        Grand Rapids, MI 49503-2633
                        (616) 742-7420
                        james_fisher@fd.org

Reported By:          Annette Blough CRR/CRC/RPR/CSR-5191
                        Certified Shorthand Reporter
                        (800) 408-0070

Defense Exhibit 2 - 001

I N D E X

Examinations                                                    Page

        NONE


                        E X H I B I T S


No.     Description                            Offered/Admitted Page

        NONE

Grand Rapids, Michigan.

Wednesday, October 26, 2022 - 11:03 a.m.

(On the record at 11:03 a.m.)

THE CLERK: All rise, please. Hear ye, hear ye, hear ye, the United States District Court for the Western District of Michigan, the Honorable Janet T. Neff, United States District Judge presiding. All persons having business before the Court, draw near, give attention, and you shall be heard.

God save the United States and this Honorable Court.

The Court is in session. You may be seated.

THE COURT: Good morning, everybody. This is the date and time set for sentencing in Case Number 1:21-cr-99, the United States of America versus Jonathan Joshua, is it Munafo?

MR. FISHER: Yes, Your Honor.

THE COURT: Which one?

MR. FISHER: Munafo.

THE COURT: Munafo. Thank you. May I have appearances and introductions, please?

MR. KESSLER: Good morning, Your Honor. Nils Kessler for United States.

THE COURT: Thank you.

MR. FISHER: Good morning, Your Honor. James

Fisher on behalf of Mr. Munafo.

THE COURT:  Thank you.

On May 25, 2022, Mr. Munafo appeared in front of Magistrate Judge Phillip Green and entered a guilty plea to Count One of a Three-Count Indictment.

Count One charges Interstate threatening communications, an offense contrary to 18 USC A75C.  The maximum potential penalties for that offense are five years in prison and a $250,000 fine.

The offense behavior can be fairly summarized as follows:  Mr. Munafo made numerous, threatening phone calls to the Calhoun County Sheriff's dispatch line.  The calls were vulgar, obscene, and included threats of physical harm to the dispatcher and her family.  The Defendant's plea agreement acknowledges that he intended his statements to be threats and he knew they would be taken as such by the dispatcher.  The calls were placed from North Carolina to Michigan.

The Magistrate Judge's report and recommendation was adopted on June 9, 2022.  There is a written plea agreement, which I do accept at this time.  And I find that the charge that the Defendant plead to adequately reflects the seriousness of his actual offense behavior.  There's also a written presentence report.

Mr. Kessler, does the Government have any

quarrel with the factual recitation in the report?

MR. KESSLER:  No, Your Honor.

THE COURT:  Mr. Fisher?

MR. FISHER:  No, Your Honor.

THE COURT:  Thank you.

Mr. Munafo, a couple of questions for you. Have you read the presentence report?

JONATHAN JOSHUA MUNAFO:  Yes, Your Honor.

THE COURT:  And did you discuss it carefully and thoroughly with your attorney, Mr. Fisher?

JONATHAN JOSHUA MUNAFO:  Very carefully.  Yes, Your Honor.

THE COURT:  And, as you sit in the courtroom this morning, is there anything about the report that you either don't understand or about which you have any question?

JONATHAN JOSHUA MUNAFO:  No, Your Honor.

THE COURT:  Okay.

Now, Mr. Fisher is one of the senior members of the Federal Public Defender's Office in this district. He's well-known to this Court.  I see him regularly.  He has been appointed to represent you at no cost to you. Have you been satisfied with the work that he has done on your behalf?

JONATHAN JOSHUA MUNAFO:  Above and beyond, yes,

Your Honor.

THE COURT: Thank you.

The presentence report includes a calculation of the guidelines, and the guidelines advisory ranges as follows: The offense level is calculated at 14. The criminal history category is two based on three criminal history reports, points. Those two calculations place this case in Zone D of the grid where the incarceration is 18-24 months. The supervised release range is one to three years. The fine range is $7,500 to 75,000. Restitution is not an issue here. And there is a mandatory special assessment of $100.

There is one objection to the scoring. And that, by the defense, it relates to presentence report Paragraph 30 and guideline 3A1.2A, which concerns the enhancement for the status of the victim as a Government employee.

Mr. Fisher, do you want to put your objections on the record? I did, obviously, read the presentence report as well as your sentencing memo. But I'm sure you want to put that on the record.

MR. FISHER: Thank you, Your Honor. I'll be brief.

Your Honor, I do admit this is a fairly close case and does hinge on the facts and circumstances of the

conduct at issue. I believe the Government is prepared to attempt to rebut our argument here and support the enhancement.

But what I would say is, first of all, we are conceding that this was, by definition, a Government officer. She fits within the definition. We don't dispute that. And probation adequately supported the prong of the enhancement.

The issue is whether or not the conduct was motivated by her status. And I think, referring to the guideline, it says in application note three in the commentary: Motivated by such status means the offense and conviction was motivated by the fact that the victim was a Government officer or employee.

Now, I don't think the facts support that definition here. Mr. Munafo's call originally was not motivated to harass or intimidate anyone. He was calling this dispatcher, as I set forth in my objection and my sentencing memo, to report and planned out a video that he had seen on the Internet during a period of time in which he was in a heightened state of mental distress, frankly, for lack of way of describing it, lack of sleep, highly agitated state during this period in his life.

After that call was screened to a certain degree by the dispatch caller, he became irate, not

because of the fact that this person was a Government employee, thwarting his attempt to speak with a law enforcement officer, but because of how he perceived the call, the receiver, the victim in this case, to be interacting with him. And I think that is clear from the audio recordings that I've listened to and the transcript that I received. And the overall tenor of his conversation is based upon his incorrect assessment of what was happening in terms of his interaction with the dispatch person on the other end of the phone.

I think that differentiates this from cases where the enhancement is more commonly employed. And I think the example the Government cites and the example in the application note talks about if somebody kidnaps a person for ransom and they can't claim, for example, that they just did it for the money, in that case the person is being kidnapped because they are a Government employee, not just because they are a person. I think these are differentiating factors here that Mr. Munafo's conduct was not -- the reason for his conduct was not the identity of this person. That's where I think the objection hinges on that word motivated by.

And the definition I have for motivation is that it was a reason for his behavior. I don't think the reason here was because of this person's employment. It

was because of his perception of the conduct of the person towards him and the offense that he took, disproportionate to any possible offense, but the offense that he took at her filtration of his call.

THE COURT: Thank you, Mr. Fisher.

MR. FISHER: Thank you, Your Honor.

THE COURT: Mr. Kessler?

MR. KESSLER: Yes, Your Honor.

Just to take the guideline argument first under the application of 3A1.2, the rule, that is correct, does have two parts to it. First, that there was a Government employee. And, second, that the Defendant was motivated by that status.

If you look at the actual exception to that rule, it's for private disputes. That's not what we have here. What they have in mind, the example that's actually cited in there is two postal employees get into a fight in the Post Office. It's not because of their status as postal employees. Or, for example, if my neighbor were to know I'm a prosecutor but threatened me because my dog is barking in the middle of the night, it's not because I'm a prosecutor.

In this case it's clear that he deliberately did this because he wanted to harass law enforcement. I have a couple of quick exhibits that I would like to play

10

for the Court for two purposes.  First off, they deal with this particular issue.  I think you can tell when you actually hear them, much more so than when you see them on the page, what the motive was.

And, second, I think they go to the 3553A factor, which I will argue later, that the nature and circumstances of the offense.  Just to hear it yourself, I think, is important.  It's a total of four minutes, Your Honor, to hear them all.

The first one you can tell that he is deliberately calling the Calhoun County Sheriff's Office, that is why I selected that.  The second one you will hear the threat itself.  And you will hear him talking about the Insurrection Act, which is inextricably tied into his motive, which we see the very next day.  The third one is him taunting them.  And by this point we are three hours deep into him calling, 143 calls deep, and he is still calling them because they are a law enforcement agency.  That is clear in what he says during the taunting.  And then the fourth thing is I would just show you some pictures from the District of Columbia's complaint that just actually show him assaulting law enforcement officers less than 24 hours later, which is tied into this Insurrection Act motivation that he had.

So, with your permission, I would go ahead and

play those, Your Honor.

THE COURT: Please do.

MR. KESSLER: I did prepare a transcript just to make is easier to follow along, although I think it's pretty clear, if I can approach.

THE COURT: Thank you.

MR. KESSLER: And that beeping we heard is my computer timing out, so.

This first recording that we will hear, and all of them, you will hear the date and time at the very beginning.

(Recording begins at 11:14 a.m.)

January 5, 2021. 6:49:17 p.m.

DISPATCHER: Calhoun County Dispatch.

JONATHAN JOSHUA MUNAFO: Hi, I'd like to speak with an on-duty officer or sergeant, please.

DISPATCHER: Okay, for what department?

JONATHAN JOSHUA MUNAFO: I'm sorry?

DISPATCHER: For what department?

JONATHAN JOSHUA MUNAFO: The Sheriff's Department.

DISPATCHER: Okay, what's going on?

JONATHAN JOSHUA MUNAFO: Na, I'd like to speak with a police officer or a sergeant on duty, please.

DISPATCHER: I heard what you said, but I'm

Case 1:21-cr-00009-VFN   ECF No. 72, PageID.357   Filed 11/14/22   Page 12 of 37

12

asking you what it's in, um, what it's for.

JONATHAN JOSHUA MUNAFO:  With who am I speaking?

DISPATCHER:  My badge number is 58317.

JONATHAN JOSHUA MUNAFO:  Who are you?  Uh-huh. And?  I don't know who I'm talking to.  I want to speak to a police officer.

DISPATCHER:  Okay.  Well, the police officers are not in the dispatch center, so can I help you with something specific?

JONATHAN JOSHUA MUNAFO:  You can take my name and number and have them call me back is what you can do and lose the attitude as well.  It's not necessary and it's unbecoming of your department.

DISPATCHER:  Sure.  Okay, what is your name?

JONATHAN JOSHUA MUNAFO:  It's Yankee, Y-A-N-K-E-E; last name is Patriot, P-A-T-R-I-O-T.

DISPATCHER:  Your name is Yankee Patriot?

JONATHAN JOSHUA MUNAFO:  That is the name I'm providing you.  Are you questioning my...are you questioning me?

DISPATCHER:  Okay, and what's your phone number?

JONATHAN JOSHUA MUNAFO:  You have a bad attitude, lady.

DISPATCHER:  And what's your phone number?

JONATHAN JOSHUA MUNAFO:  Your shield number again for me?  I know this is a recorded line but.

DISPATCHER:  I don't have a shield number.  I have a badge number.  It's 58317.

JONATHAN JOSHUA MUNAFO:  What is the difference between a shield and a badge?  I'm sorry.

DISPATCHER:  I don't carry a shield.  I'm a dispatcher, sir.

JONATHAN JOSHUA MUNAFO:  Ah, that's what I figured.  That is why I'm calling to speak with a police officer that is on duty.

DISPATCHER:  Okay, well, police officers don't sit in the dispatch center, sir.  Can I have your phone number, please?

JONATHAN JOSHUA MUNAFO:  When I'm speaking, you're not going to interrupt me.  Do you understand me?

DISPATCHER:  Can I have your phone number, please?

JONATHAN JOSHUA MUNAFO:  When I'm speaking, you don't get the chance to speak.

(Recording concludes at 11:16 a.m.)

MR. KESSLER:  This next call I'm going to play, Your Honor, illustrates, again, he knows that he is calling the Calhoun County Dispatch Center and he begins

taunting them by virtue of their being a police agency.

(Recording begins at 11:16 a.m.)

January 5, 2021.  7:26:47 p.m.

SUPERVISOR:  Calhoun County Dispatch.

JONATHAN JOSHUA MUNAFO:  You're putting people's lives in jeopardy by me tying up the line.  Put the fucking cop on the phone, now!

SUPERVISOR:  This is an administrative line, sir.

JONATHAN JOSHUA MUNAFO:  Put the fucking cop on the phone, now!

SUPERVISOR:  I will not allow you to speak to me that way.  Good-bye.

JONATHAN JOSHUA MUNAFO:  Put a cop on the line, or I, I am not gonna stop calling.

SUPERVISOR:  You will stop calling, sir.

JONATHAN JOSHUA MUNAFO:  I fucking guarantee you I won't.

SUPERVISOR:  Okay.  Well, I mean, there are ways we can take care of things.

JONATHAN JOSHUA MUNAFO:  Oh, yeah.  Go ahead, ping me!  Find me!  You don't know where in the fuck in the county I am.

SUPERVISOR:  That's okay.

JONATHAN JOSHUA MUNAFO:  Ma'am, put a fucking

cop on the phone now, you stupid bitch, or it's gonna go way worse for your family. I'm not joking. This is not some bullshit call.

SUPERVISOR: Don't make threats to me on this line, sir.

JONATHAN JOSHUA MUNAFO: Hey, hey, lady, I'm telling you. This isn't a threat. It's a fucking promise. You are putting people's lives in jeopardy. Put a fucking cop on the phone, now!

SUPERVISOR: There are no officers in the dispatch center. We've explained that to you.

JONATHAN JOSHUA MUNAFO: Lie! Then you put me on hold for nine minutes, why? Why?

SUPERVISOR: Trying to get a hold of the sergeant. And we have other 911, sir.

JONATHAN JOSHUA MUNAFO: You haven't picked up the phone.

SUPERVISOR: Sir, sir, sir.

JONATHAN JOSHUA MUNAFO: You stupid bitch.

SUPERVISOR: Sir.

JONATHAN JOSHUA MUNAFO: I'm gonna make you eat your fucking nose. I'm gonna hurt you bad for this. It won't be today. It won't be tomorrow. It'll be fucking soon, though, you stupid cunt. Insurrection Act? I'm coming to your door first.

Defense Exhibit 2 - 015

Case 1:21-cr-00099-JRN   ECF No. 77, PageID.361   Filed 11/11/22   Page 16 of 37

16

(Recording concludes at 11:18 a.m.)

MR. KESSLER:  And finally, Your Honor, in the last call, which is very brief, this is the last one of the 143, and it's three hours later, you can see that he is still doing it for the same reason.

(Recording begins at 11:19 a.m.)

January 5, 2021.  9:46:59 p.m.

SUPERVISOR:  Calhoun County Dispatch.

JONATHAN JOSHUA MUNAFO:  Well, now that I'm out of your jurisdiction, and your state, I am definitely not stopping.  So, good luck extraditing my ass for a fucking misdemeanor warrant.  Ha!  During COVID.

SUPERVISOR:  Sir, if you don't have an emergency, we are going to disconnect the line.

JONATHAN JOSHUA MUNAFO:  I'm disconnecting the line now.

(Recording stopped at 11:19 a.m.)

MR. KESSLER:  And, finally, Your Honor, I'm going to put up some pictures from the Washington D.C. complaint.  As I mentioned earlier, the acts in this case were all from January 5th.  And on January 6th Mr. Munafo participated in the raid on the capitol in Washington D.C.

I'm just going to flip to the page with the pictures.  I will blot this one on the third page.  As

you can see from the caption, it says screen shot from the F.B.I.s., be on the lookout video alert for Suspect Number 170, which is Mr. Munafo, posted on YouTube.

These screen shots show Munafo, I'm sorry, Munafo punching a U.S. capitol police officer twice in the head before ripping the officer's riot shield out of his hands.

Show the next one.

THE COURT: I'm not seeing these, Mr. Kessler.

MR. KESSLER: They were not showing up, Your Honor?

THE COURT: No.

MR. KESSLER: They were when we tried it out before we came in. Let's see if...

THE COURT: Here we go.

MR. KESSLER: Okay. I will just blow that one up again.

Ready for the next one, Your Honor?

THE COURT: Yes.

MR. KESSLER: This one reads figure four and five, two screen shots from open source video, showing Munafo striking the U.S. capitol police officer with a closed fist.

Go to the next page.

Captions at the bottom. But this first one

here that I'm blowing up, you can see Mr. Munafo with his hands on a capitol police officer's shield while the officer is ducking below it.

Next one says two screen shots from open source video, showing Munafo pulling the U.S. capitol police riot shield away from the U.S. capitol police officer. Once Munafo succeeded in pulling the riot shield away from the USCP officer, he passed it to others in the crowd behind him.

And then the final page I was going to show you, figures eight and nine, a screen shot from open source video showing Munafo circled in red, receiving a flag pole with what appears to be a combination of the flag of the United States and what is known as a Gadsden flag.  There is an example of that.

And then the next page or the next picture, a screen shot from open source video showing Munafo holding a flag pole with the U.S. Gadsden flag attached.  And right an image of Munafo striking a window of the capitol with a flag pole.

So, Your Honor, to go back to the discussion about 3A1.2, what he is arguing essentially is that this is just a customer service dispute because he wanted service from the 911 dispatcher or the Sheriff's Office Dispatcher.

What the first audio shows is he called a Government agency on purpose with the explicit aim of harassing them.  143 calls is really what proves it more than anything.  Obviously, I wasn't going to play all those for the Court.  But one call, maybe two, maybe three; but there is no reason to call 143 times unless your purpose is to taunt them.  And every time he calls he knew he was calling the Calhoun County Sheriff's Department.

The fact he said in the second one:  You're putting lives on the line by talking to me, only makes sense in the context of him having a dispute with a Government agency, not a private dispute.  He is leveraging that.  He knows that they need that line cleared in order to help people with actual emergencies. And he is calling them and threatening them with the harm that might come to other people because they aren't giving him what he wants.

And then he refers to himself only as Yankee Patriot, and says each call is going to be a charge and says you will never find me.  Again, showing that he knew he was dealing with a law enforcement agency and was deliberately taunting them.

And then I think we can't forget the fact that this is January 5th, and the next day he is physically

assaulting police for reasons that have to do with the same thing he was taunting Calhoun County about, where he said the Insurrection Act, for example, which is tied up with this whole notion that was driving people to assault law enforcement at the capitol. The idea that the former president would invoke the Insurrection Act, making them some sort of official militia.

And then I think we need to look at what would in a trial context be, 404B, both the fact of what he did after at the capitol and the fact that he did similar things in the past, calling the Massachusetts State Police over and over and over again. Again, not a customer service dispute.

So I think it's pretty clear from all of this that his intent was to harass them and threaten the dispatcher because she was a Government employee.

THE COURT: Thank you, Mr. Kessler.

Well, I'm not sure that the photographs are particularly relevant here. But I also don't see this as a closed case at all, Mr. Fisher. I think it's pretty clear that Mr. Munafo's motive was to call and harass a law enforcement agency and employee. And so, respectfully, the objection to the scoring is overruled.

My calculations then are the same as the presentence writers, offense level 14, criminal history

category four, a range for...

MR. KESSLER: Your Honor, I think what Ms. Bockheim was just...

THE COURT: I'm sorry.

MR. KESSLER: I think you may have mistakenly said criminal history category four.

THE COURT: Oh, I'm sorry, criminal history category two. Advisory guideline range for custody 18-24 months. For supervised release, 1-3 years. The advisory range for the fine is $7,500 to 75,000. Restitution is no issue. And we do have the $100 special assessment.

Now, there are a number of departure motions brought by the defense, citing guidelines 5H1.3, 5C1.1, and 5K2.13, and dealing with Mr. Munafo's mental and emotional conditions and making the allegation or at least raising the question of diminished capacity.

Mr. Fisher, would you like to put your objections on the record for your motion, on the record for those?

MR. FISHER: Your Honor, I should clarify. I did not file a separate downward departure motion in this case.

THE COURT: Right.

MR. FISHER: Because he has already exceeded the minimum guidelines that apply here by the time he is

Defense Exhibit 2 - 021

served.  We are not asking for a reduction below the 18 months because he has already served it.  So I just put these in for the policy position that they stand for.  Obviously, I think that Mr. Munafo's condition at the time of offense has bearing on the sentence under both the guidelines and 3553A.

I think the evaluation that we've attached to our sentencing memorandum, previous evaluation by the Bureau of Prisons Doctoral, although not as favorable to our argument, I think, also goes quite far in showing that Mr. Munafo was in a heightened state of agitation and not taking prescribed medication, not sleeping at and near the time of this offense, all of which would support the Court sentencing him at the lower range of the guidelines under these policy positions rather than at the higher end as the Government urges.

THE COURT:  Thank you, Mr. Fisher.

So we have advisory guideline ranges as follows:  18-24 months incarceration.  One to three years supervised release.  $7,500 to $75,000 fine.

Mr. Kessler, accurate?

MR. KESSLER:  Yes, Your Honor.

THE COURT:  Mr. Fisher?

MR. FISHER:  With our previous objection noted, Your Honor, yes.

THE COURT:  Thank you.

Mr. Fisher, are you ready for your allocation?

MR. FISHER:  I am, Your Honor.

Your Honor, I will just start where I kind of left off a moment ago with the policy positions that I indicated in my policy statements, I've indicated for my sentencing memorandum.

I think that Mr. Munafo's history, specifically his family history, and his history of trauma and abuse throughout his life have led directly to a series of conditions, post-traumatic stress disorder, bipolar disorder, various diagnosed mental health conditions throughout his life that were not being treated adequately, if at all, at the time he committed this offense.  I think that goes the most to explaining why he is here today.

At a time in his life, he spent about a year of his life driving around the country with no real ties to any particular graphic area, no support system whatsoever, and certainly no consistent mental health treatment.  It's obvious from his record that he was receiving sporadic mental health treatment from his teenage years until this offense was committed.

He -- after the offense was committed, he voluntarily surrendered to Edgewater Police officers in

Florida. When he was transported up here, he was also not receiving adequate mental health care. When I first met him, he was similarly in a state of emotional impairment and mental health impairment, which resulted in him being sent to the Bureau of Prisons for an evaluation.

He has since improved dramatically. And I can say from my interactions with him over that period of time that his dedication, once we resolved the underlying distrust that he had for me, his dedication to his own mental health and trying new medications as they became available until something really worked for him, he has dramatically improved. I can honestly say that he is not the same person today that he was when he came into this courtroom on the indictment or that he was when he committed this offense.

And the surest way to achieve the purposes of sentencing in this case, from my perspective, is to make sure he is getting the adequate and obviously needed mental health treatment that is required. To that end, I think that the Court's conditions of supervision, indicating that he is required to undergo mental health treatment once released from any sentence, I think is a laudable requirement.

I'd also ask the Court, if the Court is going

to impose any incarceration sentence, contrary to our request of the time served sentence here, that the Court place him in Butner so that he can receive adequate mental health treatment while there. I think that that is the best Bureau of Prisons facility for treatment for mental health disorders post adjudication or preadjudication for that matter.

THE COURT: I wonder, Mr. Fisher, with regard to placement at Butner, whether there would even be enough time to do that. Even if I opted for the high end of the guidelines, he has served more than a year, right, almost a year and a half?

MR. FISHER: Almost. It's 18 months, Your Honor.

THE COURT: Yeah, I really wonder with six months left there would be, given all of the administrative and bureaucratic issues that the Bureau of Prisons goes through, that they would even have the time to get him to Butner.

MR. FISHER: I agree, Your Honor. It's more of a prophylactic measure to make sure that the record is clear, that would be the intent of the Court if the Bureau of Prisons does accept him.

The other issue is, of course, he does have a pending District of Columbia matter that is still

outstanding.  He has not been adjudicated on that issue yet.  We would ask the Court order that he be transported to the District of Columbia so that he can resume that case and his defense in that case.

THE COURT:  Is there a warrant outstanding?

MR. FISHER:  He has got a detainer, Your Honor. He was arrested for, I believe, both offenses at or near the same time.  It's somewhat unclear to me from the record who has primary jurisdiction.  But I believe it's us at this point.  So he needs to go there as soon as possible rather than going to Oklahoma first would be our preference.

THE COURT:  Okay, thank you.

Anything further, Mr. Fisher?

MR. FISHER:  No, Your Honor.  I do think that Mr. Munafo warrants a lower end of the sentence here. This is clearly a case where mental instability played a huge role in the commission of the offense.  Sentencing him to additional prison time on top of that would not achieve the purpose of sentencing, as outlined in the statute and my sentencing memo.  Thank you.

THE COURT:  Thank you, Mr. Fisher.

Now, Mr. Munafo, I'm sure that Mr. Fisher has explained to you that at this time you have the right to speak in your own behalf, to tell me anything that you

think is important for me to know about you, about what you've done, and so forth.  You don't have to speak, but you have the right to do so.  So if you would like to come to the podium to speak with Mr. Fisher, I'll hear what you have to say; but it's up to you.

JONATHAN JOSHUA MUNAFO:  Thank you, Your Honor.  Thank you for this opportunity, Your Honor.  I'll be brief.  As I've written in the PSI, a lot of what I was hoping to convey to you, Your Honor, against the advice of Counsel, I understand that, you know, the mental health aspect of things is important to his defense.  And but I can do nothing but take full accountability for my actions.  And what I said, it was...I just...I don't believe in excuse necessarily.  You know, my mental health shouldn't disturb justice for them because what I did to them was disgusting.  And I hope you have an opportunity to share my letter with them somehow, the victims in the case.  And I thank you for your opportunity to speak.

THE COURT:  Well, thank you for your comments, Mr. Munafo.  You may return to your seat.

JONATHAN JOSHUA MUNAFO:  Yes.

THE COURT:  Mr. Kessler, on behalf of the Government?

MR. KESSLER:  Yes, Your Honor.  I will try to

Defense Exhibit 2 - 027

be brief as well and just cover the 3553 factors.

As far as the nature and circumstances of the offense here, it wasn't just going after one particular person he had a beef with. This was politically motivated, as you can tell from him saying Insurrection Act and what he did the next day. He acknowledged himself that he was putting lives in jeopardy. It wasn't just the threat to the dispatcher. He tied up their emergency dispatch line for three hours with 143 calls. So he really was putting other people's lives in jeopardy as well.

And, as is noted in the PSR, this is an experienced dispatcher. It wasn't the first one he talked to. He talked to the supervisor, the threats that you heard. And this is somebody who is used to hearing things like this, hearing crazy things all day long for a living. And she was extremely upset by what happened here and had to take a break.

The history and characteristics of the offender, he has got an exceptionally long criminal history. I'm sure it's all somewhat tied up with his mental health challenges. But it's a lot of instances of person-on-person violence and threats. So it's the same thing over and over again. Mental health issues definitely played into it, but it's pretty clear,

including from the psychiatric report from this evaluation, that he knew the difference between right and wrong here.

As far as respect for the law, his priors already tell us that he didn't have much respect for the law. But you can hear it in how he is almost teasing them. This is a misdemeanor. Ha, good luck catching me. You don't know where I am.

And then we see what he did the next day, physically assaulting law enforcement officers. So that shows a complete lack of disrespect for the law.

As far as deterrence, obviously, there is specific deterrence that we have to think about because he has done this kind of thing many times before. But the general deterrence is very important in a case like this. There is a whole media ecosystem out there that is devoted to inciting this kind of behavior. And that people who are inciting it will say we didn't mean that you should take us literally when you said you should fight like hell, or whatever. But people do take those things literally, and this is an example of that. And I think people who might take those things literally need to be put on notice that there are consequences for trying to solve your political issues with violence.

And then, finally, protection of the public.

We have seen some of the other instances that are reflected in the PSR. The Defendant shoved a woman at a rest stop for no reason other than looking at his car and the political stickers that were on it, an instance of him pummeling someone in the face. And then there is him attacking capitol police on January 6th.

So I think for all of those reasons a sentence at the high end of the guidelines is appropriate in the case, Your Honor.

THE COURT: Thank you, Mr. Kessler.

Well, the guidelines, which we've referenced here this morning, are certainly advisory. But I do have to consult them and give them consideration before reaching a sentence, which is reflective of my duty to impose a sentence which is sufficient but not greater than necessary to comply with the purposes of Section 3553A.

Now, Mr. Kessler has gone through some of the factors under the statute. And I think it's important to note them as well. The nature and circumstances of this offense show it to be really very serious. We have aggravated threats with serious claims of harm to the dispatcher and who knows who else. I have no doubt that the dispatchers who talked with Mr. Munafo, and who were at least in the clips that I heard, were not at all

defensive or off putting; but trying to discern the reasons for the call so that they might provide the services that they are supposed to provide. And the fact that they were or probably were most disturbed by these comments is certainly understandable.

In looking at the history and characteristics of Mr. Munafo, we have a 35-year-old single man with a GED and long-term, serious mental health issues. I read through the report of the competency exam done by the Bureau of Prisons. And if even -- if what is reported there is even only partially accurate, this man has suffered serious abuse and neglect throughout his childhood as well as sexual abuse.

Regardless of that, he was found to be competent to face trial and is not insane. And, frankly, his comments here today really do reflect that. And I attribute that to the fact that he is now taking psychotropic medication, which deals with the mental health issues, which may well have, and probably did, play a significant part in his behavior. And, as pointed out by Mr. Kessler, there are charges open in Washington D.C. which he will have to face.

In looking at the purposes of sentencing, under the statute, certainly they all come into play. I think there has to be not only deterrence, but in terms of

Case 1:21-cr-00099-JPN   ECF No. 77, PageID.577   Filed 11/11/22   Page 32 of 37

32

apprising others of the consequences of this kind of action, but that there will be punishment as well, that there has to be some respect for the law, which I think Mr. Munafo was aware of that, was aware that he was disrespecting the law in the phone calls that he made. And protection of the public, the -- it's difficult to know under circumstances like these exactly what Mr. Munafo might have done had he not been found and arrested.

And, you know, I think, again, the criminal history of Mr. Munafo shows some -- shows criminal contempt, shows violence, shows weapons.  And so protecting the public from someone who we have no idea what will set him off is something that the Court takes very, very seriously.

So the question then becomes whether the guidelines provide the appropriate sentence under the statute.  And recognizing that there's no presumption that the advisory ranges are correct, I will tell you that I had a very difficult time, based on my own review of the whole file, in determining whether the guidelines do provide an appropriate sentence.  I did consider very seriously exceeding the guidelines.  And what -- Mr. Fisher's arguments with regard to the role of the mental health issues is one that I take very seriously.

But I also take very seriously whether the uncontrolled mental health issues might lead to injury to others as well as, really, to Mr. Munafo himself.

But I did determine that, pursuant to the Sentencing Reform Act of 1984, that the guidelines are appropriate. I think that, based on all of the sentencing factors, that a variance below that, down to, for instance, time served, which would get me to approximately the lower end of the advisory range, is not convincing. I think that, pursuant to the Act, the sentence is for 24 months incarceration, to be followed by three years of supervised release, subject to the standard conditions of reporting and remaining law abiding.

There are some additional sentencing conditions. And we did provide an order to that effect to Mr. Munafo and Mr. Fisher prior to the hearing. And they both signed it, indicating they understand it and have read it. And I'm signing it for entry.

The additional conditions are explained by the presentence writer in Paragraph 124 of her presentence report. The fine is waived, restitution is not an issue. I do order the mandatory special assessment of $100.

I am -- I don't know whether I can even order the Bureau of Prisons to send him to Washington to face

the charges there without further detention here in Michigan. I will -- I will include that in the recommendations that I make. I will say, I will indicate that Mr. Munafo should be forthwith delivered to the authorities in Washington to deal with whatever charges against him are there. There is, obviously, the issue of, you know, whatever happens there and then supervised release here. The Bureau of Prisons is going to have to figure that out somehow. And I don't know how they will do that.

But in the event they don't do that, that they don't take him to D.C. and that they do have some time to deal with his issues, I will make the recommendation for a thorough mental health evaluation and programming, for vocational programming and for substance abuse programming. And, again, I think, given the relatively short time that he will be here in custody, it probably will not effectuate that at all.

Mr. Kessler, does the Government move to dismiss Counts Two and Three of the Indictment?

MR. KESSLER: We do, Your Honor.

THE COURT: Thank you.

There is no -- there is no forfeiture issue here.

Are there any legal objections to this sentence

which I have just stated, that are not already on the record?

MR. KESSLER:  No, Your Honor.

THE COURT:  Thank you.

MR. FISHER:  Other than those already raised, Your Honor, no.

THE COURT:  Thank you.

Mr. Munafo, we have to talk about your right to appeal.  You do have the right to appeal this sentence, which I've just imposed.  And there are two things that you need to know about that today.  The first is that a judgment is going to be entered today, and that will start a 14-day period running.  What that means is that in the next 14 days you have to decide if you want to appeal.  You need to talk with Mr. Fisher about that.  He can answer your questions.  He can tell you what your options are, what the potential consequences are.  But the important thing to do, for you to remember is that you must tell him what you want to do, do you or do you not want to appeal?

The second thing for you to know is, if you do wish to appeal, Mr. Fisher will continue to represent you.  Do you think you understand those two things?

JONATHAN JOSHUA MUNAFO:  Yes, Your Honor, I do.

THE COURT:  Okay.  I do want to wish you well.

I know you've had a very, very difficult time.  And it has created some real problems for you.  I hope that you will continue to follow the protocols for your mental health treatment.  And that you can get yourself back on the right track so that when you do come back to the community you will be someone who can participate positively in that.

With that, the Defendant is remanded to the custody of the United States Marshal; and we are adjourned.

THE CLERK:  All rise, please.  The Court is adjourned.

(Adjourned at 11:50 a.m.)

STATE OF MICHIGAN)

) ss

COUNTY OF KENT   )

I, Annette R. Blough, CRC/CRR/RPR/CSR-5191, do hereby certify that I reported the foregoing proceedings before the JANET T. NEFF, JUDGE of the United States District Court, Western District of Michigan, Grand Rapids, Michigan; that the same was reduced to typewritten form, and that the attached 37 pages constitute a full, true and accurate transcript.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of November, 2022.

_____
Annette R. Blough, CRC/CRR/RPR/CSR-5191 and Notary
Public, Ottawa County, acting in Kent County, Michigan.
My Commission expires 1-17-2027